The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Lorrie L. Dollar. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except with the modification of Findings of Fact Nos. 29 and 30, and Conclusions of Law No. 3 and Award No. 4.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and the employment relationship existed between the parties at all relevant times.
2. Allstate Insurance Company was the insurance carrier on the risk.
3. On November 19, 1987, the plaintiff sustained an admittedly compensable injury when he fell a distance of approximately ten feet from a scaffold, landing on both wrists on the floor of the warehouse.
4. As a result of the admittedly compensable injury, the parties entered into a Form 21 Agreement for compensation, pursuant to which plaintiff's average weekly wage was established as $526.00, yielding a compensation rate of $308.00.
5. At the hearing, the parties stipulated a videotape, marked as defendant's exhibit 14, and 310 pages of medical, vocational, and rehabilitation reports into evidence.
6. On February 18, 1994, a Form 24 Request to Stop Compensation was approved by the Commission; and no benefits were paid beyond that time.
7. The issues for determination are:
 a. Whether plaintiff was working on December 1, 1993?;
 b. Whether plaintiff is entitled to compensation from the date of the approval of the Form 24?;
 c. Whether plaintiff is entitled to future medical care?; and
 d. Whether plaintiff is entitled to have his attorney's fees paid directly by defendants?
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing, the plaintiff was a 60-year-old right-hand dominant male who had attended school through the tenth grade. At age 50, the plaintiff obtained his G.E.D. The plaintiff had a history of high blood pressure and cholesterol.
2. The plaintiff began working for defendant-employer in 1952, and continued to work for Sears for 39 years in a job which required heavy manual labor.
3. On November 19, 1987, the plaintiff sustained an admittedly compensable injury when he fell approximately ten feet to the floor of the warehouse, landing on both wrists and his right knee. As a result of the impact, a permanent dental bridge was knocked out of plaintiff's mouth.
4. As a result of the fall, plaintiff suffered bilateral displaced fractures of his wrists, for which he was treated by Dr. Maultsby. Initially, Dr. Maultsby performed surgery on each of plaintiff's wrists to correct the Ace Colles fractures by use of external fixation devices. Due to continued complaints of pain, the plaintiff was referred to Dr. Gary Kuzma, an orthopedic surgeon with a subspecialty in hand surgery.
5. The plaintiff returned to light duty work for brief periods of time up until April 17, 1991, which was his last day of work with Sears. Temporary partial disability compensation was paid for those periods of time, pursuant to Form 26 Supplemental Agreements, as previously cited herein. Plaintiff's job with Sears is no longer available due to closure of the warehouse.
6. From 1988 when he assumed treatment of plaintiff, Dr. Kuzma performed surgery to release the right carpal canal and Guyon's canal, left carpal tunnel release of the ulnar nerve, and left carpal canal release on Guyon's canal. On November 17, 1988, Dr. Kuzma operated to correct the malunion of the Colles fracture of the left wrist, performing an oesteotomy with iliac crest graft to form internal fixation of the left radius.
7. In 1989, Dr. Kuzma performed surgery on the left ulna, and in 1990, the plate and screws from the internal fixation had to be removed. Subsequently, exploratory surgery was performed on the right ulnar digital nerve. On November 30, 1990, plaintiff underwent left wrist reconstruction surgery using the extensor carpi ulnaris.
8. On April 25, 1991, Dr. Kuzma performed surgery to stabilize the extensor carpi ulnaris by transfer of the pronator quadratus muscle from the side of the ulna to the space between the ulna and radius, in an effort to minimize the pain plaintiff has continued to experience in the left arm.
9. Following the multiple surgeries, plaintiff has received physical therapy at the Maultsby Clinic, Triad Rehabilitation Therapy, and the Hand Clinic.
10. The plaintiff has been prescribed an interosseous splint for the left wrist by Dr. Kuzma. This medical device has a projected useful life of approximately two years, and Dr. Kuzma has opined that it will need to be replaced in order to provide plaintiff with some relief from his left arm pain as it aids to reduce some of the pain experienced by plaintiff due to impingement of the radius on the ulna.
11. Dr. Kuzma has suggested surgery to fuse the radius and ulna in the left arm. However, due to the severe and dystrophic pain plaintiff has experienced, Dr. Kuzma has indicated that this surgery will increase the plaintiff's permanent impairment rating, as the fusion would eliminate plaintiff's ability to rotate the palm up or down.
12. On January 22, 1992, Dr. Kuzma rated the plaintiff as having a 50 percent permanent impairment to the left arm, due to loss of mobility and strength, entrance into the joint, and instability of the radius and ulna. The right arm was rated with a 30 percent permanent partial impairment due to loss of mobility, grip strength and sensation.
13. A functional capacity evaluation on January 12, 1992, indicated plaintiff capable of sedentary work. Dr. Kuzma has further restricted plaintiff to lifting not more than ten pounds on an occasional basis.
14. Dr. Kuzma has expressed the opinion that plaintiff is capable of driving a vehicle, raising a car hood, opening a car door, raising his hands above his head, having sufficient grip strength to manipulate jumper cables, and playing Nintendo video games.
15. The plaintiff can read and write, and is able to drive a car short distances.
16. On August 4, 1992, Dr. Maultsby performed arthroscopic surgery on plaintiff's right knee.
17. Since April 17, 1991, the plaintiff has not been engaged in any employment.
18. In December of 1992, defendant retained American Rehabilitation to provide vocational assistance to the plaintiff. Ann Welch, a vocational counselor, was assigned to plaintiff's case.
19. Since the work-related injury, plaintiff has developed arthritis in both wrists. In addition, he has experienced a narrowing of the spinal canal at the C4-5 level.
20. Correspondence between plaintiff's counsel and vocational counselor, Ann Welch, ensued in December of 1992. Plaintiff's counsel requested that Ms. Welch agree not to give legal advice to the plaintiff, that she agree to comply with the North Carolina Bar Association Guidelines for the utilization of medical rehabilitation specialists in workers' compensation claims, that she provide copies of her activity reports on plaintiff's file to counsel, that she verify job leads as being approved by plaintiff's physician, as being within plaintiff's restrictions, that she copy all correspondence to plaintiff's doctors to counsel, that she meet initially with plaintiff at counsel's office, and that job search activities be restricted to the Greensboro vicinity.
21. The requests made by plaintiff's counsel to Ms. Welch were reasonable and conducive to a positive working relationship. Although Ms. Welch correctly noted that she is a vocational counselor and not a medical rehabilitation specialist, the Bar guidelines would not impose an undue burden on Ms. Welch, and were designed to promote professionalism.
22. The record clearly establishes that a professional, mutually beneficial relationship did not exist between the plaintiff's counsel and the vocational counselor, and Ms. Welch refused to be subject to the requests made by plaintiff's counsel. Counsel then refused to permit Ms. Welch to meet with the plaintiff, and her vocational activity on the file soon ceased.
23. On a typical day, the plaintiff would meet a group of former co-workers at a local restaurant for breakfast. Most of the men were retired from Sears upon the closure of the warehouse, and two of the men are disabled from work due to causes not related to the work. Following breakfast, the group adjourns to reassemble at Rubin White's Auto Sales, where the owner, Rubin White, is a friend of the men. Mr. White operates a small car business. The men watch television, play Nintendo, and talk in the recreation room at Mr. White's business, until midday when they go to lunch or return home.
24. Rubin White's Auto Sales business is housed in a small building which has an office on the right side and a recreation room on the left side. Mr. White and his daughter work in the office. Occasionally, when Mr. White or his daughter are unavailable, the plaintiff or one of the other men will answer the telephone in the office.
25. On or about November 24, 1993, defendants retained MJM Investigations to conduct surveillance of the plaintiff, and private investigator Michael Kester was given the assignment. On December 1, 1993, Mr. Kester went to Rubin White's business and walked on the lot to look at a vehicle. Mr. White was busy at the time, and the plaintiff walked out of the building and offered to open the vehicle for Mr. Kester. The plaintiff was observed to have difficulty opening the door of the vehicle, and he used both hands to raise the hood of the vehicle. Mr. Kester did not observe the plaintiff wearing his left arm brace; however, plaintiff was wearing a jacket which would have covered the brace. The plaintiff did not offer to sell the vehicle to Mr. Kester; and in fact, when Mr. White completed his other business, he came over to assist Mr. Kester and plaintiff returned to the building. Later, Mr. Kester observed plaintiff drive a vehicle to a car wash, but did not observe the plaintiff wash the vehicle.
26. On December 29, 1993, Mr. Kester observed plaintiff assisting a female motorist on Randleman Road to restart her car with the use of jumper cables. There was no evidence offered that plaintiff engaged in this service for pay.
27. There was no evidence presented that Mr. White paid the plaintiff nor was there evidence that plaintiff was employed by Mr. White nor does plaintiff hold a state license to sell vehicles.
28. On July 26, 1994, Dr. Kuzma opined that plaintiff was in need of additional therapy for range of motion and strengthening.
29. The greater weight of the evidence presented suggests that the plaintiff was not working or employed on or about December 1, 1993, and that the Form 24 was approved improvidently. Additionally, the Full Commission finds that plaintiff continued to be totally disabled as of the date of the approval of the Form 24 on February 18, 1994.
30. Based upon plaintiff's counsel's representation of plaintiff for five and one-half years, and having successfully represented the plaintiff through two hearings, a Full Commission appeal, and this second hearing before the Full Commission, plaintiff's counsel is entitled to an attorney's fee in the amount of $500.00 for this second hearing before the Full Commission to be paid by defendant.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. The plaintiff continues to be totally disabled from work due to the compensable injury sustained on November 19, 1987. As a result of his continuing disability, the plaintiff is entitled to have total disability compensation reinstated, with benefits to resume as of the date of the approval on the Form 24, on February 18, 1994.
2. The plaintiff continues to be entitled to medical treatment as may be necessary to provide relief, effect a cure, or lessen his period of disability.
3. The Full Commission finds that plaintiff's counsel is entitled to an attorney's fee in the amount of $500.00 for this second hearing before the Full Commission pursuant to N.C.G.S. § 97-88, this being an unsuccessful appeal by the defendants.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Subject to a reasonable attorney's fee herein approved, the defendants shall resume paying total disability compensation from February 18, 1994, and continuing until such time as the plaintiff returns to work or until further order of the Commission. Such compensation as has accrued shall be payable to plaintiff in a lump sum.
2. A reasonable attorney's fee in the amount of twenty-five percent of the compensation due plaintiff shall be deducted from any sums due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be payable to counsel.
3. Defendants shall provide compensation for medical expenses incurred, or to be incurred, as a result of the compensable injury.
4. Plaintiff's counsel is entitled to an attorney's fee in the amount of $500.00 to be paid by defendant.
5. Defendants shall pay the costs.
FOR THE FULL COMMISSION
 S/ _____________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ _______________________ THOMAS J. BOLCH COMMISSIONER
S/ _______________________ DIANNE C. SELLERS COMMISSIONER
CMV/cnp/mj 8/30/95